## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| SH3 HEALTH CONSULTING, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 4:20-cv-00605-SRC |
| | ) | |
| SAM PAGE, M.D., in his official capacity as County Executive of St. Louis County, Missouri, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS SAM PAGE, M.D. AND EMILY DOUCETTE, M.D.'S OPPOSITION TO PLAINTIFFS SH3 HEALTH CONSULTING, LLC AND ELDER ANTIQUES, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER

**LEWIS RICE LLC**

Dated:  May 5, 2020      By:    /s/ Neal F. Perryman

Neal F. Perryman, #43057 (MO)
Michael L. Jente, #62980 (MO)
Jerina D. Phillips, #65103 (MO)
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
Telephone: (314) 444-7661
Facsimile:  (314) 612-7661
nperryman@lewisrice.com

and

**BETH ORWICK**
**COUNTY COUNSELOR**
Steven J. Capizzi, #56209 (MO)
Associate County Counselor
Office of County Counselor
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042 tel.
(314) 615-3732 fax
scapizzi@stlouisco.com

*Attorneys for Defendants Sam Page, M.D. and Emily Doucette, M.D.*

2378019

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................. 2

   A. Factual Background .................................................................................. 2

      1. The Evolution of the Worldwide COVID-19 Health Crisis ..................... 2

      2. The Current County Stay-at-Home Order ................................................ 3

      3. The Missouri Department of Health and Senior Services Orders .............. 4

   B. Procedural Background .............................................................................. 5

   C. Allegations in the Complaint ..................................................................... 6

III.    ARGUMENT ................................................................................................. 6

   A. Standard of Review .................................................................................... 7

   B. SH3's Motion for TRO Should Be Denied Because the Court Should Stay this Matter
      Pursuant to the *Pullman* Abstention Doctrine and Related Issues of Comity. ..................... 7

   C. SH3's Motion for TRO Should Be Denied Because the Balance of the Equities and
      Public Interest Strongly Disfavor Granting the Requested Relief. ........................................ 8

   D. SH3's Motion for TRO Should Be Denied under the Supreme Court's Longstanding,
      and the Eighth Circuit's Recently Applied, Standard for Evaluating Constitutional
      Challenges to Governmental Responses to Public Health Crises such as that Presented
      by COVID-19. ................................................................................................... 11

      1. *Jacobson v. Massachusetts* .................................................................. 11

      2. *In re Rutledge* ..................................................................................... 13

3. The County Stay-at-Home Order Has a Real and Substantial Relation to the Protection

of the Public Health and Safety and Is Not, Beyond All Question, a Plain, Palpable

Invasion of Rights Secured by the Fundamental Law. ........................................... 14

E.  SH3's Motion for TRO Should Be Denied because SH3 Is Not Likely to Succeed on the

Merits, in that the County Stay-at-Home Order Is a Lawful Exercise of Powers Bestowed

by Article VI, Section 18(c) of the Missouri Constitution. .................................................17

F.  SH3's Motion for TRO Should Be Denied because SH3 Is Not Likely to Succeed on the

Merits, in that the County Stay-at-Home Order Is Consistent with 19 CSR 20.20-050(3)

and Section 192.290 RSMo., the Regulation and Statute on which SH3 Relies. ................20

IV.   CONCLUSION .............................................................................................................. 22

# **TABLE OF AUTHORITIES**

**Cases**

*401 S. 18th Street, LLC v. O'Loughlin*,

Case No. 4:20-cv-00583 SRC, 2020 WL 2114493 (E.D. Mo. May 4, 2020)............................ 7

*Amdocs, Inc. v. Bar*,

No. 4:16CV323 HEA, 2016 WL 9405679 (E.D. Mo. May 23, 2016)....................................... 7

*Avanti Petroleum, Inc. v. St. Louis Cty.*,

974 S.W.2d 506 (Mo. Ct. App. 1998)..................................................................................... 18

*Barber v. Jackson Cty. Ethics Comm'n*,

935 S.W.2d 62 (Mo. Ct. App. 1996)....................................................................................... 19

*Birchansky v. Clabaugh*,

955 F.3d 751 (8th Cir. 2020) ................................................................................................... 6

*Casper v. Hetlage*,

359 S.W.2d 781 (Mo. 1962) ................................................................................................... 19

*City of Berkeley, Missouri v. Ferguson-Florissant Sch. Dist.*,

No. 4:19CV168 RLW, 2019 WL 1558487 (E.D. Mo. Apr. 10, 2019) ..................................... 7

*Craig v. City of Macon,*

543 S.W.2d 772 (Mo. banc 1976)........................................................................................... 17

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*,

640 F.2d 109 (8th Cir. 1981) .................................................................................................... 7

*Doe v. McCulloch*,

835 F.3d 785 (8th Cir. 2016) .................................................................................................... 8

*Flower Valley Shopping Ctr., Inc. v. St. Louis Cnty.,*

    528 S.W.2d 749 (Mo. banc 1975) ........................................................................ 17

*Frank v. City of St. Louis,*

    Case No. 4:20-CV-00597 SEP, --- F. Supp. 3d ----, 2020 WL 2116392 (E.D. Mo. May 2,

    2020) ........................................................................................................ 8, 9, 10

*Gelco Corp. v. Coniston Partners,*

    811 F.2d 414 (8th Cir. 1987) ............................................................................... 7

*Gish v. Newsom,*

    2020 WL 1979970 ...................................................................................... 15, 16

*Green v. Missouri,*

    |734 F. Supp. 2d 814 (E.D. Mo. 2010) .................................................................. 6

*Green v. Nocciero,*

    676 F.3d 748 (8th Cir. 2012) ............................................................................... 6

*Hartman v. Acton,*

    Case No. 2:20-CV-1952, --- F. Supp. 3d ----, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020)  11

*Hellman v. St. Louis Cnty.,*

    302 S.W.2d 911 (Mo. 1957) ......................................................................... 17, 19

*In re Abbott,*

    954 F.3d 772 (5th Cir. 2020) .............................................................................. 14

*In re Rutledge,*

    No. 20-1791, --- F.3d ----, 2020 WL 1933122 (8th Cir. Apr. 22, 2020) ......................... passim

*Jacobson v. Massachusetts,*

    197 U.S. 11 (1905) ..................................................................................... passim

*King v. Blake*,

    No. 4:08CV1050 RWS, 2009 WL 73678 (E.D. Mo. Jan. 9, 2009) ........................................... 7

*Legacy Church, Inc. v. Kunkel*,

    No. CIV 20-0327 JBSCY, 2020 WL 1905586 (D.N.M. Apr. 17, 2020) .................................... 2

*Lighthouse Fellowship Church v. Northam*,

    Case No. 2:20CV204, --- F. Supp. 3d ----, 2020 WL 2110416 (E.D. Va. May 1, 2020) ......... 10

*McDougall v. Cnty. of Ventura Cal.*,

    Case No. 20-CV-02927-CBM-(ASx), 2020 WL 2078246 (C.D. Cal. Apr. 1, 2020) ............... 11

*Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*,

    871 F.2d 734 (8th Cir. 1989) ................................................................................................ 7

*Pepper v. St. Charles Cty., Missouri*,

    517 S.W.3d 590 (Mo. Ct. App. 2017) .................................................................................. 17

*Prince v. Massachusetts*,

    321 U.S. 158 (1944) ............................................................................................................ 12

*Pursuing America's Greatness v. Fed. Election Comm'n*,

    831 F.3d 500 (D.C. Cir. 2016) .............................................................................................. 8

*Readey v. St. Louis Cty. Water Co.*,

    352 S.W.2d 622 (Mo. 1961) ................................................................................................ 19

*Scott v. Dep't of Pub. Safety Excise Div.*,

    792 F. Supp. 666 (E.D. Mo. 1992) ....................................................................................... 6

*State ex rel. St. Louis Cty. v. Campbell*,

    498 S.W.2d 833 (Mo. Ct. App. 1973) ............................................................................. 17, 19

*Tolle v. Northam*,

No. 1:20-CV-363 LMB/MSN, 2020 WL 1955281 (E.D. Va. Apr. 8, 2020)................... 8, 9, 10

*United States v. Caltex*,

344 U.S. 149 (1952)......................................................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7 (2008)............................................................................................................... 8

**Statutes**

Revised Statutes of Missouri, Section 192.290 .................................................... 20, 21

Revised Statutes of Missouri, Section 192.300 ............................................................ 18

**Other Authorities**

St. Louis County Ordinance No. 602.020...................................................................... 18

**Regulations**

Missouri Code of State Regulations:  Title 19 Section 20-20.050 ............................... 18

Missouri Code of State Regulations:  Title 19, Section 20-20.010(37)........................ 20

Missouri Code of State Regulations:  Title 19, Section 20-20.040(2)(E)..................... 19

Missouri Code of State Regulations:  Title 19, Section 20-20.040(2)(G) .................... 19

Missouri Code of State Regulations:  Title 19, Section 20-20.040(2)(I)...................... 19

Missouri Code of State Regulations:  Title 19, Section 20-20.050(3).................... 20, 21

**Constitutional Provisions**

Constitution of Missouri, Article IV, Section 18(c) ...................................................... 7

Constitution of Missouri, Article VI, Section 18....................................................... 2, 17

Constitution of Missouri, Article VI, Section 18(c) ............................................... 17, 19

Missouri Constitution of 1945, Article IV, Section 37................................................ 18

Defendants Sam Page, M.D., County Executive of St. Louis County, Missouri ("Dr. Page"), and Emily Doucette, M.D., Director of the St. Louis County Public Health Department ("Dr. Doucette") (together, the "County Defendants"), pursuant to the Court's Order dated May 4, 2020 (Doc. No. 10), submit this Memorandum in Opposition to the Motion for Temporary Restraining Order ("Motion for TRO") of Plaintiffs SH3 Health Consulting, LLC ("SH3") and Elder's Antiques, LLC ("Elder") (together, "Plaintiffs").[1]

## I.      INTRODUCTION

Plaintiffs SH3 and Elder seek to enjoin aspects of the County's Stay-at-Home Order and the stay-at-home order of the City of St. Louis (the "City" and the "City's Stay-at-Home Order"), respectively, in light of the expiration of certain stay-at-home orders previously entered by Randall W. Williams, M.D., FACOG, the Director of the Missouri Department of Health and Senior Services.  (*See* Complaint, Doc. No. 1, *passim*.)  SH3 contends that the provisions of the County Stay-at-Home Order restricting and limiting the activities of non-Essential Businesses (as defined by the County Stay-at-Home Order) are no longer authorized under Missouri law, such that their continued imposition violates certain of SH3's rights secured by the U.S. Constitution.

The County Defendants respectfully submit that SH3's Motion for TRO should be denied. As an initial matter, as set forth in greater detail in the County Defendants' Motion to Stay and Memorandum in Support filed contemporaneously herewith, the County Defendants submit that the Court should abstain from resolving the constitutional questions presented by SH3 in accordance with the *Pullman* abstention doctrine and related issues of comity.  Moreover, the

---

[1] Because only SH3 asserts claims and raises challenges with respect to St. Louis County (the "County") and the County Defendants, this Memorandum in Opposition is directed specifically to the Motion for TRO to the extent filed and asserted by SH3.  That said, several of the County Defendants' arguments would apply with equal force to the claims asserted by Elder.

County Defendants submit that the balance of the equities and public interest overwhelmingly weigh against granting the relief requested by SH3, such that SH3's Motion for TRO should be denied on that basis alone.  Relatedly, pursuant to the framework articulated over a century ago by the United States Supreme Court and very recently articulated by the Eighth Circuit Court of Appeals, the County Stay-at-Home Order is constitutional notwithstanding any burdening of SH3's constitutional rights, as it is intended to, and does, protect public health and safety.  Finally, the County Defendants contend that, contrary to SH3's contentions, the Stay-at-Home Order is a proper exercise of the authority bestowed upon the County and the County Defendants under Article VI, Section 18 of the Missouri Constitution and, in any event, comports with applicable Missouri statutes and regulations.  For all of these reasons, as discussed further below, SH3's Motion for TRO should be denied.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      The Evolution of the Worldwide COVID-19 Health Crisis

St. Louis County, along with the rest of the world, is in the midst of an unprecedented global health crisis due to the COVID-19 virus.  *See In re Rutledge*, No. 20-1791, --- F.3d ----, 2020 WL 1933122, at *1 (8th Cir. Apr. 22, 2020).  "On January 20, 2020, the United States Centers for Disease Control and Prevention ('CDC') reported the United States' first case of coronavirus in the State of Washington."  *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 WL 1905586, at *2 -3 (D.N.M. Apr. 17, 2020).  On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency.  *Legacy Church*, 2020 WL 1905586, at *3.

Every day, the number of people infected with COVID-19 continues to rise, along with the virus' death toll.  As of May 5, 2020, testing has revealed 1,171,510 cases in the United States

(19,138 new cases day-over-day), with 68,279 deaths (823 new deaths day-over-day).  CDC, Cases in the U.S., *available at*:  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 5, 2020).  The County currently has 3,569 confirmed cases of COVID-19 and 189 deaths.   St. Louis County, Missouri, COVID-19 Statistics, *available at*: https://stlcorona.com/resources/covid-19-statistics1/ (last visited May 5, 2020).  By way of comparison, the entire State of Missouri has 8,916 cases of and 377 deaths on account of COVID-19.   Missouri Department of Health & Senior Services, COVID-19 Outbreak, *available at*: https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/results.php (last visited May 5, 2020).  In other words, COVID-19 is disproportionately prevalent in the County (and, as the City may contend, the City as well) as compared to the rest of the State.

### 2. The Current County Stay-at-Home Order

On April 20, 2020, Dr. Doucette issued an Extension and Amendment of the Stay-at-Home Order, *i.e.*, the County Stay-at-Home Order.  (*See* Exhibit 4 to Plaintiffs' Complaint, Doc. No. 1-7.)  The County Stay-at-Home Order explains its purpose thusly:

> The intent of this order is to ensure that the maximum number of people remain in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 within St. Louis County. When people leave their place of residence, whether to obtain or perform essential services, or to otherwise facilitate otherwise authorized activities, they should at all times reasonably comply with Social Distancing Requirements.  This order extends the effective date of the order until it is rescinded.

(*Id.*, § II.)  As relevant here, the County Stay-at-Home Order requires that all businesses other than Essential Businesses (as defined in the County Stay-at-Home Order, *see* § III(F)[2]) cease their

---

[2] As relevant here, the County Stay-at-Home Order does not include "fitness and exercise gyms" or "similar facilities" within the definition of "Healthcare Operations," which are considered an Essential Business under the County Stay-at-Home Order.  (County Stay-at-Home Order, Exhibit 4 to Plaintiffs' Complaint, Doc. No. 1-7, § III(M).)  In short: There is no dispute that SH3 is not an "Essential Business" within the meaning of the County Stay-at-Home Order, such that, for example, SH3 cannot open its gym to the public for purposes of persons exercising.

activities, with certain exceptions:

    C.    Businesses

        1.    Essential Businesses may continue necessary activities so long as they comply, to the maximum extent possible, with Social Distancing Requirements for both employees and members of the public, including but not limited to, customers standing in line.  All Essential Businesses are strongly encouraged to remain open.

        2.    All businesses other than Essential Businesses shall cease all activities within the County except:

            i.    Minimum Basic Operations;[3] and

            ii.    business activities consisting of employees or contractors performing activities at their own Residences (i.e., working from home).  Businesses may provide pickup or delivery services so long as they otherwise comply with this Order.

        3.    No businesses or persons may operate or engage in a Prohibited Activity.

(*Id.*, § IV(C).)

### 3.    The Missouri Department of Health and Senior Services Orders

The Missouri Department of Health and Senior Services ("DHSS") previously enacted stay-at-home orders.  (*See* <u>Exhibit 7</u> and <u>Exhibit 8</u> to Plaintiffs' Complaint, Doc. Nos. 1-10 and 1-11.)  The DHSS's final stay-at-home order expired by its own terms on May 3, 2020, though schools remain closed for the remainder of the 2019-2020 academic school year.  (*Id.*)

On April 27, 2020, the DHSS entered an order setting forth further regulations and limitations in connection with limiting the spread of COVID-19.  (A copy of the DHSS's April 27,

---

[3] "Minimum Basic Operations" is defined in the County Stay-at-Home Order as "the minimum necessary activities to maintain the value of a business's inventory, provide security, process payroll or employee benefits, or to facilitate employees of the business being able to continue to work remotely from their Residences."  (County Stay-at-Home Order, <u>Exhibit 4</u> to Plaintiffs' Complaint, Doc. No. 1-7, § III(P).)

2020 Order is attached hereto as <u>Exhibit A</u>.)  Importantly, the DHSS stated:

> Pursuant to section 192.290, RSMo., this Order shall be observed throughout the state and enforced by all local and state health authorities; **provided however, nothing herein shall limit the right of local authorities to make such further ordinances, rules, regulations, and orders not inconsistent with this Order which may be necessary for the particular locality under the jurisdiction of such local authorities.  Local public health authorities are hereby directed to carry out and enforce the provisions of this Order by any legal means.**

(*Id.*, p. 2 (emphasis added).)  Relatedly, guidelines from the Governor of the State of Missouri and/or the DHSS provide:

> **Can my local health authority impose requirements that are more restrictive?**
>
> Yes.  This Order establishes the minimum requirements that must be complied with statewide.  **Local health authorities may enforce more restrictive public health requirements for businesses or individuals.**
>
> The only exception is the Order from the Director of the Department of Health and Senior Services dated March 24, 2020, removing the authority of a local health authority from closing or restricting the operations of a business which is a part of the food supply, whether that be agricultural production, manufacturing, distribution, or sale of food.  This limited waiver does not limit the authority of a local health authority from closing or restricting the operations of a retail food establishment.

(Guidelines and Frequently Asked Questions, attached as <u>Exhibit B</u> hereto, pp. 6-7 (emphasis added).)

**B.**   **Procedural Background**

Plaintiffs commenced this action on May 4, 2020.  (*See* Doc. No. 1.)  That same day, Plaintiffs filed their Motion for TRO.  (Doc. No. 2.)  In their Motion for TRO, Plaintiffs seek to enjoin certain aspects of the County Stay-at-Home Order and the City Stay-at-Home Order.  (*See* Motion for TRO, Doc. No. 2, "Wherefore" clause, p. 5.)

Pursuant to the Court's May 4, 2020 Order, the County Defendants' instant Memorandum in Opposition to Plaintiffs' Motion for TRO is due by 11:59 p.m. tonight, May 5, 2020.  (*See* Doc.

No. 10.)  Argument is set on Plaintiffs' Motion for TRO for tomorrow, Wednesday, May 6, 2020 at 10:30 a.m.  (*See* Doc. No. 11.)

## C.  <u>Allegations in the Complaint</u>

SH3 contends that the continued implementation of the County Stay-at-Home Order infringes upon its rights of association and assembly under the First Amendment to the U.S. Constitution and due process rights under the Fourteenth Amendment to the U.S. Constitution, in that SH3's gym must remain closed (*i.e.*, its members cannot visit the gym to exercise).[4] (Complaint, Doc. No. 1, ¶¶ 51-52.)  To this end, SH3 assert claims under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201.  (*Id.*, ¶¶ 8-9, 86.)

# III.  ARGUMENT

As discussed further below, SH3's Motion for TRO should be denied because: (i) this Court should stay this matter pursuant to the *Pullman* abstention doctrine and related issues of comity; (ii) the balance of the equities and public interest strongly disfavor granting SH3 the injunctive relief it has requested, *i.e.*, enjoining the County Stay-at-Home Order with respect to its restrictions on non-essential businesses; (iii) under the applicable framework set forth by the United States Supreme Court and as recently articulated by the Eighth Circuit Court of Appeals, the County Stay-at-Home Order is a valid governmental response to a public health crisis notwithstanding any otherwise impermissible burdening of SH3's constitutional rights; (iv) the County Stay-at-Home Order is a valid exercise of the County's and the County Defendants'

---

[4] SH3 also contends that its rights under the Privileges or Immunities Clause of the Fourteenth Amendment to the U.S. Constitution are also violated.  (Complaint, Doc. No. 1, ¶ 51.) SH3 acknowledge that this claim is not viable under current law.  (*See id.*, p. 10 n.1.)  SH3 is correct.  *See, e.g.*, *Birchansky v. Clabaugh*, 955 F.3d 751, 756 (8th Cir. 2020); *Green v. Missouri*, 734 F. Supp. 2d 814, 840–41 (E.D. Mo. 2010), *aff'd sub nom. Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012), *Scott v. Dep't of Pub. Safety Excise Div.*, 792 F. Supp. 666, 669 (E.D. Mo. 1992). Thus, the County Defendants do not address it further herein.  That said, SH3's Motion for TRO would fail for reasons set forth herein even if based on this claim.

powers pursuant to Article VI, Section 18(c) of the Missouri Constitution; and (v) the County Stay-at-Home Order is valid under the Missouri statutes and regulations relied upon by SH3.

## A.     Standard of Review

"In determining whether to issue a temporary restraining order, the Court must consider four factors: (1) the threat of irreparable harm to the movant; (2) the potential harm to the nonmoving party should an injunction issue; (3) the likelihood of success on the merits; and (4) the public interest." *401 S. 18th Street, LLC v. O'Loughlin*, Case No. 4:20-cv-00583 SRC, 2020 WL 2114493, at *2 (E.D. Mo. May 4, 2020) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). "The burden of proving these prerequisites is entirely on the party seeking injunctive relief." *Id.* (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (en banc); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). "Temporary injunctive relief functions to 'preserve the status quo until, upon final hearing, a court may grant full, effective relief.' " *City of Berkeley, Missouri v. Ferguson-Florissant Sch. Dist.*, No. 4:19CV168 RLW, 2019 WL 1558487, at *2 (E.D. Mo. Apr. 10, 2019) (quoting *Amdocs, Inc. v. Bar*, No. 4:16CV323 HEA, 2016 WL 9405679, at *3 (E.D. Mo. May 23, 2016)). "A temporary restraining order is an extraordinary and drastic remedy and the burden of proving that the relief should be awarded rests entirely on the movant." *Id.* (quoting *King v. Blake*, No. 4:08CV1050 RWS, 2009 WL 73678, at *1 (E.D. Mo. Jan. 9, 2009)) (internal alterations omitted).

## B.     SH3's Motion for TRO Should Be Denied Because the Court Should Stay this Matter Pursuant to the *Pullman* Abstention Doctrine and Related Issues of Comity.

As discussed in the County Defendants' Motion to Stay and Memorandum in Support, which the County Defendants incorporate herein by reference, SH3's Motion for TRO should be denied because the Court should stay this matter pursuant to the *Pullman* abstention doctrine and

related issues of comity.  In this regard, as discussed below, the County Defendants submit that

the County and the County Defendants have the authority under Missouri state law to enact and

enforce the County Stay-at-Home Order.  To the extent any doubt exists, the issue would be, at

most, unsettled.  The federal constitutional issue presented by SH3 might be mooted by a state-

court determination of the questions of state law SH3 has asserted, *i.e.*, an alleged conflict between

state and local law.  As a result, the County Defendants respectfully submit that the Court should

stay this matter and, concurrently, deny SH3's Motion for TRO.  *See generally Doe v. McCulloch*,

835 F.3d 785, 788 (8th Cir. 2016).

**C.**     **SH3's Motion for TRO Should Be Denied Because the Balance of the Equities and**
          **Public Interest Strongly Disfavor Granting the Requested Relief.**

In the event the Court declines to abstain and stay this matter, the County Defendants

submit that SH3's Motion for TRO can be resolved based on the balance of the equities and public

interest factors alone.[5]  *See generally Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23-24

(2008) ("[E]ven if plaintiffs have shown irreparable injury from the Navy's training exercises, any

such injury is outweighed by the public interest and the Navy's interest in effective, realistic

training of its sailors.  A proper consideration of these factors *alone* requires denial of the requested

injunctive relief." (emphasis added)).

This is the path the Eastern District of Virginia Federal Court took in a recent, similar case,

*Tolle v. Northam*.  In *Tolle*, the plaintiff alleged that Virginia's Temporary Stay at Home Order

due to Novel Coronavirus violated his constitutional rights in relation to his desire to participate

in public worship at his church and, as a result, the plaintiff sought an order from the court staying

---

[5] When analyzing a motion for temporary restraining order opposed by the government,
the balance of equities and public interest factors merge because the government's interest is the
public interest.  *See Frank v. City of St. Louis*, Case No. 4:20-CV-00597 SEP, --- F. Supp. 3d ----,
2020 WL 2116392, at *5 (E.D. Mo. May 2, 2020); *Pursuing America's Greatness v. Fed. Election
Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016).

execution of the stay-at-home order.  No. 1:20-CV-363 LMB/MSN, 2020 WL 1955281, at *1-2 (E.D. Va. Apr. 8, 2020).  The court succinctly disposed of the plaintiff's motion for injunctive relief, without delving into the merits of the plaintiff's constitutional claims, as the balance of the equities and public interest overwhelmingly disfavored granting the relief sought by the plaintiff:

> Even if plaintiff were likely to succeed on the merits and to suffer irreparable harm in the absence of preliminary relief, his motion for injunctive relief fails because he has not established that the balance of equities tip in his favor or that an injunction is in the public interest.  **The alleged harms to plaintiff include the temporary inability to participate in public worship at his church and to conduct his duties as a practicing member of his church's lay ministry for the brief period that remains before the Executive Order expires.  Although the Court recognizes plaintiff's constitutional concerns, those concerns do not outweigh the severe harm defendants would suffer if they could not enforce the Executive Order.  Moreover, it is no exaggeration to recognize that the stakes for residents of the Commonwealth are life-or-death.**  Granting plaintiff's motion for injunctive relief at this time would also disserve the public interest, because enabling large groups to gather in April and May 2020 without practicing social distancing, as Tolle seems to be requesting, could facilitate the spread of the virus and endanger the lives of many Virginians, particularly given that Coronavirus cases in the Commonwealth are expected to peak during that period.
>
> None of plaintiff's other arguments in support of his motion are persuasive. For example, plaintiff suggests that the Executive Order is unprecedented. Although that may be true, the crisis imposed by the Coronavirus is also unprecedented, and the danger this crisis poses to the welfare of all residents in this Commonwealth as well as its neighboring states, fully justifies denial of plaintiff's motion.

*Id.* at *1–2 (emphasis added).

The same result is appropriate here.  Plaintiffs ask the Court to lift public health restrictions enacted to stymie the spread of COVID-19.  As Judge Pitlyk of this Court recently recognized on May 2, 2020, it cannot be said "that a temporary restraining order prohibiting the City from taking the steps it reasonably deems necessary to slow the spread of Covid-19 serves the public interest." *Frank*, 2020 WL 2116392, at *5.  As Judge Pitlyk recently explained:

> The City's interest in this case is the effective containment of the Covid-19 virus and the protection of public health.  Thus, the Court's analysis of the third and fourth [temporary restraining order] factors converge.  **There can be little doubt that the public interest heavily favors the city's ability to take steps to prevent the spread of this deadly disease.**  As the Eighth Circuit recently observed, the world "is in the midst of an unprecedented health crisis occasioned by the worldwide COVID-19 pandemic.  Every day, the number of people infected with COVID-19 continues to rise, along with the virus's death toll."

*Id.* (quoting *In re Rutledge*, 2020 WL 1933122, at *1 (emphasis added)).

In its Memorandum in Support of its Motion for TRO, SH3 seemingly recognizes the gravity of its requested relief, speculating: "Perhaps Defendants will say they know better and the harm of spreading the virus outweighs all other factors."  (Memorandum in Support of Motion for TRO, Doc. No. 3, p. 8.)  SH3 contends that such concerns—the continued, disproportionate (from a state-wide perspective) spread of COVID-19 in the County and resulting fatalities—should not stop this Court from enjoining the County's efforts to combat this public health crisis because "no single public health official is necessarily correct about the nature and course of this virus, and the state's head health official . . .  presumably believes that it is reasonable to open businesses, because he has not ordered all state non-essential businesses closed."  (*Id.*)

What SH3 overlooks is that its merits arguments are irrelevant with respect to the balance of the equities and public interest.  To be sure, SH3 wants to open its gym.  (*See* Complaint, Doc. No. 1, ¶¶ 2, 16, 36, 40; Affidavit of A. Finnegan, Doc. No. 1-5, ¶ 5 ("I want to open my gym.").)  But to do so, SH3 asks for an injunction of a public health order undeniably designed to save lives and halt the spread of a deadly disease.  This is a bridge too far.  *See Tolle*, 2020 WL 1955281, at *1-2; *Frank*, 2020 WL 2116392, at *5.[6]

---

[6] Other courts have similarly held, in the context of motions seeking to enjoin state or local stay-at-home orders on the basis that these orders infringe on certain constitutional rights, that the balance of the equities and public interest disfavor granting injunctive relief.  *See, e.g.*, *Lighthouse Fellowship Church v. Northam*, Case No. 2:20CV204, --- F. Supp. 3d ----, 2020 WL 2110416, at *16-17 (E.D. Va. May 1, 2020) (in lawsuit challenging stay-at-home order's restrictions on large

In short, the balance of the equities and the public interest, *i.e.*, SH3's inability to open its gym versus the County's interest in keeping its residents alive, overwhelmingly weigh against the issuance of a TRO.  For this reason alone, SH3's Motion for TRO should be denied.

**D.**     **SH3's Motion for TRO Should Be Denied under the Supreme Court's Longstanding, and the Eighth Circuit's Recently Applied, Standard for Evaluating Constitutional Challenges to Governmental Responses to Public Health Crises such as that Presented by COVID-19.**

As discussed further below, the Supreme Court has long held, and the Eighth Circuit has recently recognized, that individual liberties secured by the U.S. Constitution are not absolute, and the burdening of such liberties may be permissible (where it otherwise might not be) when a state or local government is responding to a public health crisis such as that presented by COVID-19.

**1.**     ***Jacobson v. Massachusetts***

Over a century ago, the United States Supreme Court considered in what circumstances a state can enact laws in response to a public health crisis that infringe on constitutional rights.  *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  In *Jacobson*, the Court confronted a conflict between the laws of Massachusetts, which empowered local boards of health to require

---

gatherings as applied to religious services, recognizing, in evaluating the balance of the equities, that "[t]he Commonwealth has a responsibility to safeguard the lives of its residents" and "a responsibility to protect frontline healthcare workers from being overwhelmed by more patients than the Virginia health system has the capacity to adequately care for" and also recognizing, regarding the public interest, that "[e]njoining the enforcement of the Governor's Orders to allow Plaintiff and other religious organizations to host gatherings of more than ten people would result in exposing a great number of people in the community to COVID-19 if even one (knowingly or unknowingly) sick person attends a worship service with more than ten people" and that "[t]his is of particular concern in counties like Accomack County, where Plaintiff is located, which has higher rates of infection and morality than many other counties"); *Hartman v. Acton*, Case No. 2:20-CV-1952, --- F. Supp. 3d ----, 2020 WL 1932896, at *11 (S.D. Ohio Apr. 21, 2020) ("If the Director's Order is enjoined, it is not merely livelihoods, but lives that would be put at risk, and the State has an interest in public health and the safety of its citizens." (collecting cases)); *McDougall v. Cnty. of Ventura Cal.*, Case No. 20-CV-02927-CBM-(ASx), 2020 WL 2078246, at *2 (C.D. Cal. Apr. 1, 2020) ("[W]hile the public interest is served by protecting Second Amendment rights, the public interest is also served by protecting the public health by limiting the spread of a virulent disease.").

vaccinations of all inhabitants, and the liberty concerns of an individual who refused vaccination. *Id.* at 12-13.  The board of health in Cambridge, Massachusetts adopted a mandatory vaccination policy while in the midst of a smallpox epidemic that was endangering public health.  *Id.* at 12. A citizen refused to be vaccinated and challenged the constitutionality of the law.  *Id.* at 13-14.

The Supreme Court held the law to be constitutional and a valid exercise of the state's police powers.  *Id.* at 35.  The Court began by recognizing the settled principle that "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by the legislative enactment as will protect the public health and the public safety."  *Id.* at 25. Though the Constitution protects certain liberties against the state's police power, "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."  *Id.* at 26.  "Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to his own, . . . regardless of the injury that may be done to others."  *Id.*

In light of these principles, the Court announced the rule that government action taken to protect public health is valid unless it "has no real or substantial relation" to public health or it is, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Id.* at 31.  The Court then wasted little time finding that vaccinations in the midst of an epidemic clearly bore a real relation to public health and did not invade constitutional rights "beyond all question." *Id.*  In short, the Court was "unwilling to hold it to be an element in the liberty secured by the Constitution" that one person should have the power to "practically strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease."  *Id.* at 37-38.  Subsequent Supreme Court decisions have bolstered the holding in *Jacobson*.  *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice

religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *United States v. Caltex*, 344 U.S. 149 (1952) (recognizing that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved").

### 2.     *In re Rutledge*

The Eighth Circuit Court of Appeals recently had cause to consider the *Jacobson* standard in the context of a public health law enacted specifically in response to COVID-19.  In *Rutledge*, the Eighth Circuit concluded that the district court committed a "clear abuse of discretion" in "fail[ing] to meaningfully apply the Supreme Court's framework for reviewing constitutional challenges to state actions taken in response to a public health crisis." *Id.* at *4.  That is, the Eighth Circuit held that the district court clearly abused its discretion in overlooking the applicable standard articulated by the Supreme Court in *Jacobson*.  *See id.*  The Eighth Circuit succinctly explained:

> In *Jacobson v. Massachusetts*, the Supreme Court held that, when faced with a public health crisis, a state may implement measures that infringe on constitutional rights, subject to certain limitations.  The Court explained that the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."  Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."  Therefore, while constitutional rights do not disappear during a public health crisis, "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."  With these conflicting considerations in mind, the Court set forth the following two-part framework: in the context of a public health crisis, a state action is susceptible to constitutional challenge only if it, "purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]"

*Id.* at \*4 (internal citations omitted).  Thus, the operative framework for analyzing a constitutional challenge to a law enacted in response to a public health crisis is a two-part inquiry: (1) whether the law has no "real or substantial relation" to the protection of the public health, the public morals, or the public safety; and (2) whether the law is, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.*  Notably, in articulating this long-standing framework, the Eighth Circuit adopted the recent rationale of the Fifth Circuit:

> The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual— that is, arbitrary or oppressive.  At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

*Id.* at \*5 (quoting *In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020))).[7]

### 3.    The County Stay-at-Home Order Has a Real and Substantial Relation to the Protection of the Public Health and Safety and Is Not, Beyond All Question, a Plain, Palpable Invasion of Rights Secured by the Fundamental Law.

In its Motion for TRO and Memorandum in Support, SH3 does not mention, let alone analyze, either *Jacobson* or *Rutledge*.  (*See* Motion for TRO, Doc. No. 2, *passim*; Memorandum in Support of Motion for TRO, Doc. No. 3, *passim*.)  Regardless, under the *Jacobson* framework, any burdening of SH3's rights secured by the U.S. Constitution is permitted, in that the enactment with which SH3 takes issue—the County's Stay-at-Home Order—was enacted to combat the

---

[7] Notably, the *Abbott* court explicitly clarified that the *Jacobson* framework is not limited in its application to different constitutional rights, stating that settled rule articulated in *Jacobson* "allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and to leave one's home."  954 F.3d at 778; *see also id.* at 778 n.1 ("*Jacobson* governs a state's emergency restriction of *any* individual right . . . . The same analysis would apply, for example, to an emergency restriction on gathering in large groups for public worship during an epidemic.").

spread of COVID-19, and does not, beyond all question, constitute a plain, palpable invasion of SH3's rights secured by the fundamental law.

First, the County Stay-at-Home Order has a real and substantial relation to the protection of the public health and safety: It operates to limit the transmission of COVID-19 through reducing the frequency and proximity of person-to-person contact.  It accomplishes this in a variety of ways, such as imposing social distancing requirements, restricting large, intentional gatherings, and as relevant here, restricting, but not prohibiting, non-essential activities and the operations of non-essential businesses.  *See Rutledge*, 2020 WL 1933122, at *5 ("On the record before us, the State's interest in conserving PPE resources and limiting social contact among patients, healthcare providers, and other staff is clearly and directly related to public health during this crisis.").

Second, the County Stay-at-Home Order is not a plain, palpable invasion of SH3's freedom of association, freedom of assembly, or due process rights under the U.S. Constitution. As announced today, "public health restrictions in St. Louis County [will] be reduced starting May 18," and more guidance is forthcoming this week.  (*See* Exhibit C hereto); *see Rutledge*, 2020 WL 1933122, at *6 ("Such an expiration date makes the ADH directive a delay, not a ban. . . ."). In short, the County Stay-at-Home Order results in the temporary inability of SH3 to open its gym to the public for members to exercise.  This restriction is not, "*beyond all question*," a "plain, palpable invasion of rights secured by the fundamental law."  *See Rutledge*, 2020 WL 1933122, at *7-8 (emphasis added).

The court in *Gish v. Newsom* recently considered the *Jacobson* framework in the context of religion-based challenges to state and local stay-at-home orders enacted in response to COVID-19.  2020 WL 1979970, at *1-2.  Though the stay-at-home orders varied in their restrictions, the Riverside, California stay-at-home order prohibited "[a]ll public or private gatherings . . . including

15

but not limited to an auditorium, . . . church, . . . .or any other indoor or outdoor space used for any non-essential purpose including, but not limited to . . . church . . . ."  *Id.* at *2.  The plaintiffs sought to enjoin enforcement of the stay-at-home orders with respect to their desire to engage in religious services, practices, or activities, contending that the stay-at-home orders violated certain of their rights secured by the U.S. Constitution and the California Constitution.  *Id.* at *3.  In rejecting the plaintiff's motion for temporary restraining order, the court acknowledged the state and local officials' "right to protect California residents from the spread of COVID-19—even if those protections temporarily burden constitutional rights to a greater degree than normally permissible."  *Id.* at *4.  In this regard, the court acknowledged *Jacobson* and the two-part framework articulated therein.  *Id.* at *4-5.  Applying the *Jacobson* framework, the court concluded that the stay-at-home orders "easily" met the test:

> The Orders easily meet [the *Jacobson*] test.  First, they have a substantial relation to the COVID-19 crisis: they require the physical distancing that is needed to slow the spread of the virus.  Second, there is no "plain, palpable invasion" of Plaintiffs' free exercise of religion.  While Plaintiffs are unable to gather together in-person, they are free to gather virtually or over the phone.  They are also free to gather in-person with the members of their household.  They remain free to practice their religion in whatever way they see fit so long as they remain within the confines of their own homes.  Although physical contact with others is curtailed, a wide swath of religious expression remains untouched by the Orders.  The Orders, therefore, do not represent a plain or palpable invasion of the general right to free exercise of religion.  Accordingly, the Orders are likely a permissible exercise of executive authority during a national emergency.

*Id.* at *5.

Just as the *Gish* court held, applying the *Jacobson* two-part framework (as acknowledged by the Eighth Circuit in *Rutledge*), the County Stay-at-Home Order—a public health measure enacted in response to a worldwide health crisis—is a lawful exercise of governmental powers notwithstanding any burden on SH3's freedom of Association, freedom of Assembly, and due process rights under the U.S. Constitution.  As a result, SH3's Motion for TRO should be denied.

**E.**     **SH3's Motion for TRO Should Be Denied because SH3 Is Not Likely to Succeed on the Merits, in that the County Stay-at-Home Order Is a Lawful Exercise of Powers Bestowed by Article VI, Section 18(c) of the Missouri Constitution.**

"St. Louis County is a home rule charter county."  *State ex rel. St. Louis Cty. v. Campbell*, 498 S.W.2d 833, 836 (Mo. Ct. App. 1973).  The police power of the State of Missouri is "delegated to charter counties by the state pursuant to article VI, section 18(c)" of the Missouri Constitution as a governmental function.  *Pepper v. St. Charles Cty., Missouri*, 517 S.W.3d 590, 596 (Mo. Ct. App. 2017).  Pursuant to its police power, and other constitutionally delegated powers, a charter county "may provide for the vesting and exercise of legislative power pertaining to any and all services and functions of any municipality or political subdivision, except school districts, throughout the entire county within as well as outside incorporated municipalities."  Mo. Const., Art. VI, § 18. "Generally, the function of the police power has been held to promote the health, welfare, and safety of the people by regulating all threats either to the comfort, safety, and welfare of the populace or harmful to the public interest." *Craig v. City of Macon,* 543 S.W.2d 772, 774 (Mo. banc 1976).

A charter county thus possesses an implied grant of power "for the exercise of all powers and duties of counties and county officers prescribed by the constitution and laws of the state."  *See Hellman v. St. Louis Cnty.,* 302 S.W.2d 911, 915 (Mo. 1957).  This power is limited only if "a charter or ordinance enacted under [section] 18(b) . . . invade[s] the province of general legislation involving the **_public policy of the state as a whole_**." *Flower Valley Shopping Ctr., Inc. v. St. Louis Cnty.,* 528 S.W.2d 749, 754 (Mo. banc 1975) (internal quotation marks omitted) (emphasis added).  Accordingly, when a county is addressing a matter of a local concern, the charter supersedes state law. *State ex rel. St. Louis Cnty. v. Campbell,* 498 S.W.2d 833, 836 (Mo. Ct. App. 1973).

17

Pursuant to its police and other powers, the County enjoys broad authority to protect the public health of County residents.  *See* Mo. Const. Art. IV, § 37; Mo. Rev. Stat. § 192.300; *see also Avanti Petroleum, Inc. v. St. Louis Cty.*, 974 S.W.2d 506, 508 (Mo. Ct. App. 1998) (upholding a County tobacco-related ordinance as a valid health measure).  The County Charter expressly vests the County director of public health with "the powers and duties conferred upon deputy state health commissioners and county health officers by law and such other powers and duties as may be required by ordinance."  (County Charter, excerpts of which are attached hereto as <u>Exhibit D</u>, § 4.130.)  That section further provides that: "The director shall have the power, without limiting the foregoing general powers, to," among other things, "*[s]ee that laws and ordinances relating to public health are observed and enforced*" and *"[e]stablish and maintain such activities and clinics as are needed to promote the public health of the county*."  (*Id.*, § 4.130.5-.6 (emphasis added).)  This power has been adopted by St. Louis County Ordinance No. 602.020.  (A copy of Ordinance No. 602.020 is attached hereto as <u>Exhibit E</u>.)

Even had the DHSS declared a "statewide pandemic" pursuant to 19 CSR 20-20.050, the County's Stay-at-Home Order would remain enforceable because it protects the public health and welfare against the unique and dynamic threats that COVID-19 poses to the County and its residents—a matter of local concern, rather than one of general, statewide policy.  For instance, as while some counties or local communities in Missouri may have experienced relatively fewer cases of COVID-19, and thus can now begin reopening, the County has experienced a relatively higher number of infection.  *Compare* <u>COVID-19 Statistics</u> (cited above) *with* <u>COVID-19 Outbreak</u> (cited above).  The varied manner in which COVID-19 has affected local communities throughout the State makes the local communities' respective responses matters of local concern, particularly when local authorities determine that more stringent measures are appropriate to protect citizens.

Likewise, decisions regarding the speed at which the County can reopen, and the time, place, and manner in which that reopening should occur, are of such a distinctly local character and dependent on the unique circumstances at hand in the County, that it would be virtually impossible to reasonably make them on a general, state-wide basis.[8]

Accordingly, the Stay-at-Home Order addresses a matter of local concern and preempts any state statues or regulations purportedly in conflict. *See* Mo. Const. Art. VI § 18(c); *see also Readey v. St. Louis Cty. Water Co.*, 352 S.W.2d 622, 627 (Mo. 1961) (upholding an ordinance adding fluoride to County water as reasonably related to public health because it was designed to decrease tooth decay, a widespread and serious disease); *Casper v. Hetlage,* 359 S.W.2d 781, 790 (Mo. 1962) (10) (County zoning ordinances superseded purportedly inconsistent state statute because zoning was local issue); *State ex rel. St. Louis Cty. v. Campbell,* 498 S.W.2d 833, 836 (Mo. Ct. App. 1973) (County Charter provision relating to condemnation prevailed over state statute and rule because "the power of condemnation is a matter of local concern so that the procedure specified in the charter supersedes the statutes."); *Barber v. Jackson Cty. Ethics Comm'n*, 935 S.W.2d 62, 66 (Mo. Ct. App. 1996).  Indeed, enactment of the County's Stay-at-Home Order, to extend greater protections as a result of the unique circumstances facing the County, is a quintessential exercise of the County's constitutionally delegated power to protect the health and safety of its residents.  *See Hellman*, 302 S.W.2d at 916 ("Little purpose would be

---

[8] To be clear, the County does not suggest that the novel coronavirus is not of concern to the entire State of Missouri.  Rather, the County asserts that local government *response* to the virus based on the unique and changing threats it poses to local communities, including the issuance of quarantine orders, business closure orders, and ultimately, reopening orders, is of a distinctly and appropriately local concern.  *See, e.g.*, 19 CSR 20-20.040(2)(E) (local governments may institute quarantine measures); 19 CSR 20-20.040(2)(G) (local governments may establish appropriate control measures, including isolation, quarantine, or closure of establishments); 19 CSR 20-20.040(2)(I) (local governments may assume direct responsibility as director of health institute control measures necessary for the protection of the public health).

served in authorizing the adoption of charters of local self-government in the more populous counties if such counties could not adopt reasonable means and methods of carrying out their governmental functions in such a manner as to meet the peculiar needs of such counties.").

As a result, SH3's contention that the County and the County Defendants lack authority to continue implementation of the Stay-at-Home Order is incorrect.  SH3 is therefore unlikely to prevail on the merits, such that its Motion for TRO should be denied.

**F.**     **SH3's Motion for TRO Should Be Denied because SH3 Is Not Likely to Succeed on the Merits, in that the County Stay-at-Home Order Is Consistent with 19 CSR 20.20-050(3) and Section 192.290 RSMo., the Regulation and Statute on which SH3 Relies.**

SH3 contends that Section 192.290 RSMo., precludes the County and the County Defendants from enacting any regulation that contradicts the rules and regulations of the DHSS, including 19 CSR 20-20.050(3), which provides that, "in a statewide pandemic, only the director of the Department of Health and Senior Services or the director's designated representative shall have the authority to close a public or private school or other place of public or private assembly." 19 CSR 20-20.050(3).

SH3's contention is unlikely to succeed on the merits for a number of reasons, including that 19 CSR 20-20.050(3) is inapplicable.  Among other things, the predicate for applying 19 CSR 20-20.050(3), the DHSS's declaration of a "statewide pandemic," is not satisfied. Under the DHSS's regulations, a "statewide pandemic" is defined as "an outbreak of a particularly dangerous disease affecting a high proportion of the population, appearing in three (3) or more counties, as declared by the director of the Department of Health and Senior Services." 19 CSR 20-20.010(37). The Director of the DHSS has not declared that a statewide pandemic exists in Missouri.  (*See*, *e.g.*, the DHSS's April 27, 2020 Order, Exhibit A hereto, *passim*; the DHSS's April 16, 2020 Order, attached as Exhibit 6 to Plaintiffs' Complaint, Doc. No. 1-11, *passim*; the DHSS's April 3, 2020 Order, attached as Exhibit 7 to Plaintiffs' Complaint, Doc. No. 1-10, *passim*.)  SH3 fails to

show—indeed, it does not even attempt to show—that this condition is satisfied: SH3 presents no evidence or argument of a DHSS declaration of a "statewide pandemic," nor does SH3 attempt argue that COVID-19 is "affecting a high proportion of the population" within the meaning of the regulation. Absent a "statewide pandemic," 19 CSR 20-20.050(3) reserves the power to "close any public or private school or other place of public or private assembly" concurrently in both "the director of the Department of Health and Senior Services or the director's designated representative" *and* "the local health authority"—here, the County and its Department of Public Health (*i.e.*, the County Defendants).

The County's Stay-at-Home Order is not inconsistent with 19 CSR 20-20.050(3), and Section 192.290 RSMo thus does not preclude its enforcement.  Indeed, the DHSS has confirmed that local governments, like the County, maintain their authority to enact measures more stringent than the State's.  (*See, e.g.,* the DHSS's April 27, 2020 Order, <u>Exhibit A</u> hereto, at p. 2 ("Nothing herein shall limit the right of local authorities to make such further ordinances, rules, regulations, and orders not inconsistent with this Order which may be necessary for the particular locality under the jurisdiction of such local authorities."); Guidelines and Frequently Asked Questions, attached as <u>Exhibit B</u> hereto, at p. 7 ("Local health authorities may enforce more restrictive public health requirements for businesses or individuals.").).

For this additional reason as well, SH3 is unlikely to prevail on the merits.  As a result, SH3's Motion for TRO should be denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendants Samuel Page, M.D., and Emily Doucette, M.D. respectfully request that the Court deny Plaintiff SH3 Health Consulting, LLC's Motion for Temporary Restraining Order, and grant such other and further relief as deemed to be proper under the circumstances.

Respectfully submitted,

**LEWIS RICE LLC**

Dated:  May 5, 2020                    By:    /s/ Neal F. Perryman
                                                Neal F. Perryman, #43057 (MO)
                                                Michael L. Jente, #62980 (MO)
                                                Jerina D. Phillips, #65103 (MO)
                                                600 Washington Avenue, Suite 2500
                                                St. Louis, Missouri 63101
                                                Telephone: (314) 444-7661
                                                Facsimile:  (314) 612-7661
                                                nperryman@lewisrice.com
                                                mjente@lewisrice.com
                                                jphillips@lewisrice.com

                                                and

                                                **BETH ORWICK**
                                                **COUNTY COUNSELOR**

                                                Steven J. Capizzi, #56209 (MO)
                                                Associate County Counselor
                                                Office of County Counselor
                                                41 S. Central, Ninth Floor
                                                Clayton, MO 63105
                                                (314) 615-7042 tel.
                                                (314) 615-3732 fax
                                                scapizzi@stlouisco.com

                                                *Attorneys for Defendants Sam Page, M.D.*
                                                *and Emily Doucette, M.D.*

22