**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| SH3 HEALTH CONSULTING, LLC, et al., | ) ) ) | |
| Plaintiff(s), | ) ) | Case No. 4:20-cv-00605 SRC |
| vs. | ) ) | |
| ST. LOUIS COUNTY EXECUTIVE DR. SAM PAGE, et al., | ) ) ) | |
| Defendant(s). | ) | |

**Memorandum and Order**

Plaintiffs—two businesses that have effectively been shut down by government "stay at home" orders entered to stanch the spread of COVID-19—understandably seek to reopen. Plaintiffs claim that St. Louis City and St. Louis County lack authority under Missouri law to enter the Orders, and that the Orders violate their rights under the United States Constitution; they seek a temporary restraining order [2] to prevent Defendants from enforcing the Orders. The Court's limited role of judicial review is not to assess the wisdom of the Orders, but to determine whether the Orders violate the law. Regardless of whether the Orders violate state law, the Court finds that they do not violate the Constitution because they have a real and substantial relation to the goal of stemming the tide of the public-health pandemic, and they are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). The Court denies the motion for TRO.

1

I.      **Background**

A.      **The City and the County**

To understand the myriad state-law issues at the heart of this case, one needs to first understand the unique legal structure of St. Louis City and St. Louis County, Missouri.  At one time, the St. Louis metropolitan area operated as one county.  In 1876, the City of St. Louis split from the County, becoming an independent city, not part of any county.  *City Government Structure*, https://www.stlouis-mo.gov/government/about/city-government-structure.cfm (last visited May 7, 2020).  The City and County operate under different charters.  *See St. Louis Charter of 1914; St. Louis County Charter of 1979.*

The Missouri Constitution confers a unique dual status on the City, recognizing it as both a city and a county, while also permitting it to operate under a city (rather than county) charter; the Constitution also grants the City the rights of a county.  Mo. Const. art. VI, § 31.  The City and the County are geographically separate, and are separate political subdivisions of the state: the City has a Mayor, and the County has a County Executive, the City has a Circuit Court and the County has a Circuit Court, the City has a Circuit (prosecuting) Attorney and the County has a County Prosecuting Attorney, and as is relevant in this case, the City has a Department of Health and the County has a Department of Public Health.

Defendants all are elected or appointed officials, some of whom have various qualifications in the realm of medicine and public health.  Lyda Krewson is the Mayor of the City, an elective office.  Frederick Echols is a medical doctor and the Director of Health/Hospitals Commissioner of the City.  The City's Charter provides that the "*director of health* and hospitals shall be a regularly licensed practitioner *of* medicine and surgery and a graduate *of* a recognized school *of* medicine or shall have completed graduate work in a

2

recognized school *of* public *health* to the level *of* a Master's Degree in Public *Health* or have been certified by the American Board *of* Preventive Medicine and Public *Health*. The *director* also shall have had at least three years' experience in the practice *of* medicine and at least three years' experience in public *health* work . . ."  City Charter art. XIII, § 14C(a) (italics in original).

Dr. Sam Page is the County Executive, an elective office, and a medical doctor.  Dr. Emily Doucette is the Acting Director, Chief Medical Officer, Department of Public Health of St. Louis County.  The County's Charter provides that the Director "shall be either a licensed physician or shall be the holder of at least a master's degree in public health or hospital administration . . . If a physician, the director shall be board certified or board eligible in preventive medicine or a related specialty and shall have had at least five (5) years' executive experience in the field of public or community health."  Doc. 19-4, pg. 4.[1]

### B.      The COVID-19 health crisis

St. Louis City and County, like the rest of the country, are in the midst of a public health crisis caused by the global COVID-19 pandemic.  As of May 8, 2020, the United States has a total of 1,219,066 known cases, and 73,297 known deaths from the virus.[2]  Missouri has a total of 9,489 cases and 449 deaths.[3]  St. Louis City has 1,450 cases and 83 deaths.[4]  St. Louis County has 3,792 cases and 244 deaths.[5]  The City and County account for over 55% of the cases and over 70% of the total deaths in Missouri.  On March 13, 2020, the President of the United States

---

[1] All parties submitted a number of orders, municipal ordinances, charters, and the like; the parties stipulated on the record that the Court may consider all of the materials submitted, as well as materials referred to in the record.
[2] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the US*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 8, 2020).
[3] Mo. Dep't of Health & Senior Services, *COVID-19 Outbreak*, https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/results.php (last visited May 8, 2020).
[4] *COVID-19 Coronavirus Information: City of St. Louis Case Counts*, https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/index.cfm#CP_JUMP_813078 (last visited May 8, 2020).
[5] *COVID-19 Statistics*, https://stlcorona.com/resources/covid-19-statistics1/ (last visited May 8, 2020).

declared the COVID-19 pandemic a national emergency.[6]  On the same date, the Missouri

Governor declared a state emergency.[7]  Countless state and local governments across the country

have issued varying forms of "stay at home" orders.  *See e.g., In re Rutledge*, -- F.3d --, 2020

WL 1933122 at *1 (8th Cir. Apr. 22, 2020); *In re Abbott*, 954 F.3d 772, 779-80, 787 (5th Cir.

2020)

The State, City, and County likewise entered "stay at home" orders.  On April 3 and

April 16, 2020, Dr. Randall Williams, Director of the Department of Health and Senior Services

for the state of Missouri, issued orders directing, among others, all businesses in the entire state

to stop engaging in certain activities.  Docs. 1-10, 1-11.  On April 20, 2020, Dr. Echols and Dr.

Doucette issued separate orders that differ in many respects but similarly require all businesses,

other than essential businesses, to cease virtually all activities.  The City and County Orders

allow non-essential businesses to continue minimum basic operations, continue business

activities from their own residences, and provide pickup and delivery services.  Docs. 1-7, 1-9.

Mayor Krewson and Dr. Page adopted the doctors' positions and confirmed that pursuant to

Mayor Krewson and Dr. Page's authorities, non-essential businesses in the City and County must

remain closed indefinitely.  Docs. 1, ¶ 28; 1-8.   Both Dr. Echols and Dr. Doucette had issued

prior similar orders.  Dr. Williams's state-wide orders expired at 11:59 p.m. on May 3, 2020,

while Dr. Echols and Dr. Doucette's orders remain in place until at least May 18, 2020, as

acknowledged by Plaintiffs' counsel during the hearing.  Doc. 1-11.

---

[6] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited May 8, 2020).
[7] *Executive Order 20-02*, https://www.sos.mo.gov/library/reference/orders/2020/eo2 (last visited May 8, 2020).

### C.     The plaintiffs

Plaintiff Elder's Antiques, LLC, whose sole member is Cherri Elder, owns an antique store in the City that has been shut down by the City Order.  Doc. 1-6.  Ms. Elder wants to open her store; she wants to gather with her staff and customers to discuss antiques and their artistic merit.  Doc. 1-6.  Ms. Elder has continued to communicate with her customers via the internet. The closure of Ms. Elder's store has caused her company to stop generating revenue and has made her "financially strapped."  *Id*.  Plaintiff SH3 Health Consulting, LLC, whose sole member is Allan Finnegan, owns a gym in the County that has been shut down by the County Order. Doc. 1-5.  Mr. Finnegan states he wants to open his gym; he wants to gather with his staff and customers to exercise, and to talk about the need for exercise and social discourse to improve mental health.  *Id*.  Currently, the gym generates no revenue and Mr. Finnegan has become "financially strapped."  *Id*.  Consequently, Plaintiffs seek to have the Court declare Dr. Echol's and Dr. Doucette's orders invalid.

The City and County have filed Motions to Dismiss and/or Stay asking the Court to abstain from exercising equitable jurisdiction or, in the alternative, to dismiss the complaint for failure to state a claim.  Docs. 15, 17, 25.  The City and County argue that the Court should abstain under the *Pullman* doctrine, recognized in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), because of the complex state law issues raised about the authority granted to the State, City, and County – under the Missouri Constitution, the City and County charters, state statutes, and state regulations – to issue orders during times such as these.  In this order, the Court only addresses Plaintiffs' TRO Motion, deferring the abstention and dismissal Motions to a later order.

## II.     Standard

A Court issues injunctive relief in a lawsuit to preserve the status quo and prevent

irreparable harm until the Court has the opportunity to rule on the lawsuit's merits.  *See Devose*

*v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).  In determining whether to issue a temporary

restraining order, the Court must consider four factors: (1) the threat of irreparable harm to the

movant; (2) the potential harm to the nonmoving party should an injunction issue; (3) the

likelihood of success on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C.L.*

*Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  The party seeking injunctive relief entirely bears

the burden of proving that under these factors, the Court should issue a TRO.  *See Modern*

*Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (en banc);

*Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).  "Courts in the Eighth

Circuit apply the same standards to a request for preliminary injunction and temporary

restraining order.  *Brooks v. Roy*, 881 F. Supp. 2d 1034, 1049 n.6 (D. Minn. 2012) (citing *S.B.*

*McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989)).  "An

evidentiary hearing is required prior to issuing a[n] [] injunction only when a material factual

controversy exists."  *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 744 (8th Cir.

2002).

## III.     Discussion

Plaintiffs argue that the City and County Orders are unlawful and the Court should enjoin

enforcement of the Orders because Missouri law authorizes only the Missouri Director of Health

and Senior Services to order the closure of places of public or private assembly during a

statewide pandemic.  Plaintiffs claim that the Orders violate their rights to assembly, association,

and due process under the United States Constitution.  According to Plaintiffs, they lose their

6

right to assembly because they cannot assemble with their staff and customers in their businesses; they lose this right because they cannot gather and engage in expressive association and the advancement of shared beliefs; they lose their right to due process because the Orders violate Missouri law; they lose their right to have the liberty to go about their occupations as they choose; and they lose their right to use their assets to earn a living.

The Court does not doubt the earnestness of Plaintiffs' desire to open their businesses, generate revenue, earn a living, and employ—and as importantly, pay—others. The Court further recognizes the economic and emotional hardships these orders can impose on people and businesses.  The Court is not unsympathetic to Plaintiffs' plight, but, as explained below, in our constitutional republic, the decisions of whether, when, and how to exercise emergency powers amidst a global pandemic belong not to the unelected members of the judicial branch but to the elected officials of the executive branch.

> **A.     The limited role of the court**

Separation of powers requires that the three branches of government "stay in their lane." See *The Federalist Papers* No. 47 ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny . . . [T]he preservation of liberty requires that the three great departments of power should be separate and distinct.") (Coventry House ed. 2015); *Cf. The Federalist Papers*, No. 51.  The courts' judicial-review role furthers this principle:  in reviewing actions of the executive or legislative branches of government, the Constitution limits the role of courts to determining whether the other branches stayed in their lanes, or whether they exceeded their authority. Judicial review does not give the courts license to substitute their judgment for the decisions made by the coordinate branches of government.  When courts substitute their judgment for

judgments made by the executive or legislative branches, courts exceed their authority, veritably swerving into the lanes of the other branches, and violating the Constitutional separation of powers. *Id*.

This case illustrates the rationale underlying separation of powers. Defendants all are elected or appointed members of the executive branch of government. The citizens elect the heads of executive branches of government, rendering the executive branch politically accountable to the citizens. At the ballot box, the citizens voice their approval of disapproval of the job Mayor Krewson and Dr. Page do, by either retaining them in or voting them out of office. Unlike the judiciary, which can rely only on the evidence presented to it by litigants, the executive branch can employ experts in various fields, such as medicine and public health. Here, the City employs Dr. Echols and the County employs Dr. Doucette, who ultimately report to and serve at the pleasure of the Mayor and County Executive, respectively. City Charter Art. XIII, § 14C; County Charter, Art. III, §3.050.1. Again, the citizens, through the ballot box, can hold Mayor Krewson and Dr. Page accountable for the decisions of Drs. Echols and Doucette.

In contrast, the judicial branch has a very different structure, particularly at the federal level. Federal judges are appointed by the President and confirmed by the Senate; once confirmed, federal judges have lifetime appointments. U.S. Const. art. III § 1. The citizens thus cannot vote federal judges out of office, no matter how strenuously they may disagree with a court's decisions. The Constitution cabins federal judges' role to the narrow lane, not of policymaking but of deciding only the cases and controversies that come before them, and to declaring what the law is, not what the law should be. U.S. Const. art. III § 1.; *Cf. Marbury v. Madison*, 5 U.S. 137, 170, 177 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in

8

which they have a discretion . . . It is emphatically the province and duty of the judicial

department to say what the law is.").  And unlike the executive branch, Article III judges have

limited staffs whose expertise is not in public health, science, or other fields, but in the law.  28

U.S.C. § 752.

These distinct features of the executive and judicial branches of government explain the

limited role the courts play in reviewing executive-branch actions in a public-health crisis:

> [t]he bottom line is this: when faced with a society-threatening epidemic, a state
> may implement emergency measures that curtail constitutional rights so long as the
> measures have at least some "real or substantial relation" to the public health crisis
> and are not "beyond all question, a plain, palpable invasion of rights secured by the
> fundamental law."  Courts may ask whether the state's emergency measures lack
> basic exceptions for "extreme cases," and whether the measures are pretextual –
> that is, arbitrary or oppressive. At the same time, however, courts may not second-
> guess the wisdom or efficacy of the measures.

*In re Rutledge*, 2020 WL 1933122 at *4 (quoting *In re Abbott*, 954 F.3d at 784 (quoting

*Jacobson*, 197 U.S. at 31, 38)).

### B.   Plaintiffs' challenge of the orders

Plaintiffs challenge the Orders under two state statutes and a state regulation.  Plaintiffs

rely on the narrow theory that Drs. Echols and Doucette do not have the power to issue orders

closing businesses because during a state pandemic, only the state director of the Department of

Health and Senior Services can do so.

First, Plaintiffs cite to Missouri Revised Statute § 192.300, which states that while

"county commissions" and "county health center boards" can issue public-health orders, those

orders cannot conflict with any "rules or regulations authorized and made by the department of

health and senior services[.]"  Mo. Rev. Stat. § 192.300.1(1).  Plaintiffs also cite to § 192.290,

which further elaborates that local authorities can make ordinances, rules, and regulations that

are "not inconsistent with the rules and regulations prescribed by the department of health and

senior services[.]"  Finally, the crux of Plaintiffs' argument is Mo. Code. Regs. tit. 19, § 20-20.050(3) which states, "in a statewide pandemic, only the director of the Department of Health and Senior Services or the director's designated representative shall have the authority to close a public or private school or other place of public or private assembly."

At first blush Plaintiffs' argument seems straightforward, yet the City and County point out that the applicability of these statutes and regulation to the City and County turn on the Missouri Constitution, their respective Charters, and other statutes and regulations.  For example, Article VI, § 19(a) of the Missouri Constitution provides that charter cities possess two sources of power: (1) all powers that the general assembly of Missouri has authority to confer on a city, "provided such powers are consistent with the constitution of this state and are not limited or denied either by the charter so adopted by statute"; and (2) all powers conferred by law.  Thus, a question arises whether a charter city's power can be restricted by a state regulation.  Further complicating the issue is that § 19(a) applies to charter cities, not counties; therefore, it applies to the City but not the County.  For the County, the Court must look to Article VI, § 18, which governs the powers and limitations of county charters, and consider whether a county's home-rule authority supersedes state statutes and regulations.  Mo. Const. art. VI, § 18.

The seemingly simple analysis proffered by Plaintiffs raises additional complications. "Statewide pandemic," as defined in Mo. Code. Regs. tit. 19, § 20-20.010(37) requires the director of the Department of Health and Senior Services to "declare" a statewide pandemic. This raises questions under Missouri law of what constitutes a declaration, whether a declaration must be formal, or de facto, and if formal, what process and procedures govern the making of the declaration?  To say the least, Plaintiffs' theory involves complex state-law issues, the resolution of which would require the federal courts to analyze various provisions of the Missouri

10

Constitution, statutes, regulations, ordinances, and the City and County charters, raising comity issues and the potential for upsetting the delicate balance between federal and state courts. *Cf. Pullman*, 312 U.S. at 500-01.  The Court will address comity and abstention in a separate order. In this order, the Court focuses on the four *Dataphase* factors to determine whether it should grant Plaintiffs' Motion for a TRO.  *Dataphase Sys., Inc.*, 640 F.2d at 113.

### C.     Likelihood of success on the merits

For this factor, Plaintiffs "need only show a reasonable probability of success, that is, a fair chance of prevailing" on the merits.  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013). Plaintiffs bring their case pursuant to 42 U.S.C. § 1983.  To prevail under their narrow theory, Plaintiffs must first establish the violation of state law that they allege (i.e. that Dr. Echols and Dr. Doucette did not have the power to enter their Orders), and then they must establish that the Orders violate their fundamental rights under the U.S. Constitution.  *See* 42 U.S.C. § 1983; Doc. 1.  As Plaintiffs' counsel conceded at the TRO hearing, if Plaintiffs cannot establish either a violation of state law or a violation of the Constitution, their claims fail.  Because the Court finds Plaintiffs are unlikely to succeed on the federal issues, it does not need to reach the state law issues.

When considering constitutional challenges to state actions taken in response to a public health crisis, the Court must apply the Supreme Court's framework established in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  *In re Rutledge*, 2020 WL 1933122 at *4.  During a public health crisis, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" and states may implement measures that infringe on constitutional rights, subject to certain limitations.  *Jacobson*, 197 U.S. at 27.  Thus, in a public health crisis, "a state may implement emergency measures that curtail constitutional rights so

long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Rutledge*, 2020 WL 1933122 at *4-5 (quoting *In re Abbott*, 954 F.3d at 784 (quoting *Jacobson*, 197 U.S. at 31, 38)).

During a public crisis, a court has no authority to determine the most effective measures for protecting the public – that "judgment must be left to the governing state authorities." *In re Abbott*, 954 F.3d at 792. The court's power is limited to asking whether the governing authorities have taken action in "an arbitrary, unreasonable manner" or through "arbitrary and oppressive regulations." *Id.* at 784 (quoting *Jacobson*, 197 U.S. at 28, 38). The Court should ask if the measures provide exceptions for extreme cases but should not "second-guess the wisdom or efficacy of the measures." *Id.* at 785.

Two recent cases instruct the Court in this case. On April 22, 2020, the Eighth Circuit decided *In re Rutledge*, in which plaintiffs challenged Arkansas's emergency order to postpone all non-medically necessary surgeries, including surgical abortions, until May 11, 2020. 2020 WL 1933122 at *1. The Eighth Circuit applied the *Jacobson* framework and held that the emergency order bears a real and substantial relation to the State's interest in protecting public health during the COVID-19 pandemic, and the emergency order was not "beyond all question, a plain, palpable invasion" of the right to abortion. *Id.* at *5-8. In so holding, the Eighth Circuit emphasized the limited role of the courts, and that courts may not "usurp the functions of another branch of government" nor "second-guess the state's policy choices in crafting emergency public health measures." *Id.* at *5 (quoting *Jacobson*, 197 U.S. at 28 and *In re Abbott*, 954 F.3d at 784). When analyzing whether the order invaded the right to abortion, the Eighth Circuit looked at the temporary nature of the order and that it included exceptions. *Id.* at *7.

12

In *Rutledge*, the Eight Circuit "adopt[ed] the reasoning of" another recent COVID-19-related case, *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), decided on April 7, 2020. *Id.* at *3. As in *Rutledge*, the *Abbott* plaintiffs challenged Texas's emergency order suspending all non-medically necessary surgeries and procedures, including abortions. 954 F.3d at 780. The Fifth Circuit applied the *Jacobson* framework, giving a detailed analysis of the scope of the judiciary's authority during a public health crisis. *Id.* at 783-85. While recognizing that the order at issue was a "drastic measure," the Fifth Circuit found that the order bore a "real or substantial relation to the state's goal of protecting public health in the face of the COVID-19 pandemic," and that the order did not "beyond question violate the constitutional right to abortion." *Id.* at 787, 791.

In this case, because the City and County issued the orders to cease most operations of all non-essential businesses in response to the COVID-10 pandemic, Plaintiffs can succeed only if the Orders have "no real or substantial relation to" the public health crisis, and the Orders are "beyond all question, a plain and palpable invasion" of Plaintiffs' rights to assemble, associate, or due process.

### 1.    Relation to the public health crisis

When deciding if the Orders have a "real or substantial relation" to COVID-19 pandemic, the Court "must take care not to usurp the functions of another branch of government [] by second-guess[ing] the state's policy choices in crafting emergency public health measures." *In re Rutledge*, 2020 WL 1933122 at *5 (internal citations and quotations omitted). The Court finds a real and substantial relation between the City and County Orders and the health crisis of the COVID-19 pandemic.

The portions of the Orders at issue in this case, which effectively close non-essential businesses, relate directly to the City's and County's attempts to slow the rate of infection. The

virus spreads primarily from person-to-person through close contact with one another or by

touching a surface or object that has the virus and then touching one's mouth, nose, or eyes.

*Coronavirus Disease 2019 (COVID-19): How it Spreads*,

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last

visited May 8, 2020).  By limiting contact between individuals in places of business, the City and

County Orders attempt to slow the rate of infection and lower the rate of death.  Currently, no

vaccine exists for the virus and the best way to prevent illness is to avoid exposure.  *Coronavirus*

*Disease 2019 (COVID-19): Protect Yourself*, https://www.cdc.gov/coronavirus/2019-

ncov/prevent-getting-sick/prevention.html (last visited May 8, 2020).  The coronavirus cases in

the City and County make up over 55% of the total cases in the entire state.  Slowing down the

rate of infections is a real and serious concern that the Orders address.

The Orders also provide exceptions:  the Orders allow essential businesses to continue

operating, and non-essential business to operate out of the owners' residences and to make pick-

up and delivery orders.  Further, the Orders are of a limited duration – both the City and County

plan to review them by May 18th.  The City and County have revised their orders several times

during the pandemic, which gives reasonable assurance that the City and County will continue to

do so as evolving conditions permit.  (The City's and County's respective self-interest in

generating tax revenue from businesses provides further assurance.)  What the Supreme Court

stated over 100 years ago in *Jacobson* holds equally true today: "[T]he court would usurp the

functions of another branch of government if it adjudged, as a matter of law, that the mode

adopted under the sanction of the state, to protect the people at large was arbitrary, and not

justified by the necessities of the case."  197 U.S. at 28.

14

### 2.    Invasion of plaintiffs' rights

The Court also finds that the Orders do not constitute "beyond all question, a plain and palpable invasion" of Plaintiffs' rights to assemble, associate, or due process.  Plaintiffs simply do not meet this extremely high burden.  As the Fifth Circuit recognized in *In re Abbott*, measures that normally "would be constitutionally intolerable" such as "closed schools, sealed off nursing homes, banned social gatherings, quarantined travelers, prohibited churches from public worship services, and locked down entire cities" are now "recognized as appropriate and even necessary responses to the present crisis."  954 F.3d at 787.

In *Jacobson*, the plaintiffs challenged Cambridge, Massachusetts's order, pursuant to a Massachusetts's statute, requiring all individuals, with some exceptions, to get a smallpox vaccination, arguing the state invaded his liberty when it subjected him to a fine or punishment for refusing to get the vaccination.  197 U.S. at 12-13, 26.  The Supreme Court upheld the order finding that all rights, "[e]ven liberty itself, the greatest of all rights," are "subject to reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community."  *Id*. at 26-27.  The Supreme Court thus found the Constitution allowed the state and municipal governments to slow the spread of a disease by mandating vaccination – a forced bodily invasion – under threat of fine or imprisonment, without violating the individual's constitutional rights.  With this in mind, the Court turns to Plaintiffs' asserted rights in this case.

### a.    Right to assembly

Plaintiffs argue that under the Orders, they lose their right to assemble with their staff and customers in their businesses. The First Amendment to the U.S. Constitution guarantees that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble."

15

U.S. Const. amend. I.  While the Orders prevent Plaintiffs from assembling with others in their *physical places of business*, they do not prevent Plaintiffs from assembling in other ways.  The Orders impinge on Plaintiffs' rights to assemble *in person*, but, thanks to modern technology, Plaintiffs could, among other ways, assemble through a video call or group chat over the internet.  This temporary infringement on the right to assemble in person is not "beyond all question, a plain and palpable invasion" of Plaintiffs' First Amendment right to assemble.

### b.     Freedom of association

Plaintiffs also argue they have lost their right to associate with their customers because they cannot gather and engage in expressive association and the advancement of shared beliefs.  Individuals have a constitutional freedom of association.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984).  The Supreme Court has outlined two variations of this freedom:  the "choice[] to enter into and maintain certain intimate human relationships" as a "fundamental element of personal liberty" and to associate to "engag[e] in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Id*. at 617-18.  In this case, Plaintiffs assert the second type of association – to engage in activities protected by the First Amendment.

The right to expressive association is not absolute.  *Id*. at 623.  "Infringements . . . may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Id*.  The City and County adopted the Orders in this case to serve a compelling state interest – their interest in maintaining the health and safety of the public during a global pandemic, and to slow the transmission of COVID-19.  The only way, at present, to slow the transmission, is by distancing from one another and preventing in-person contact.  *Coronavirus*

16

*Disease 2019 (COVID-19): Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 8, 2020).  The Orders do not relate to the suppression of ideas and they apply to everyone in the City and County, no matter the reason they wish to gather and associate.  Finally, as with the right to assemble, Plaintiffs may still associate with their customers in alternative ways.  Through social media, email, blogs, and telephones, Plaintiffs can discuss whatever they would like with whomever they would like, without restraint from the Orders.  In fact, Ms. Elder has already done so by communicating with customers on social media.  Doc. 16, pgs. 9-10.  The Orders are not "beyond all question, a plain and palpable invasion" of Plaintiffs' freedom to associate.

### c.      Right to due process

Plaintiffs also assert the Orders violate their right to due process.  They do not elaborate on whether they assert a violation of their procedural or substantive due process rights.  The Due Process Clause of the Fourteenth Amendment states, "[n]o State . . . shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  This clause contains both a procedural and substantive component.  *Schmidt v. Des Moines Public Schools*, 655 F.3d 811, 816-817 (8th Cir. 2011).  The Court addresses both.

To establish a procedural due process violation, a plaintiff must show his "protected liberty or property interest is at stake" and the defendant "deprived him of such an interest without due process of law."  *Id*. at 817.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id*. at 817-818 (quoting *Clark v. Kan. City, Mo. Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (internal quotations omitted)).  Plaintiffs cannot show the City or County has deprived them of an interest without due process of law.  First, Plaintiffs do not establish what interest – life, liberty, or

property – is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("Those who seek to invoke [the Fourteenth Amendment's] procedural protection must establish that one of these interests is at stake."). But even if they did, the Missouri Administrative Procedure Act, Mo. Rev. Stat. §§ 536.010-150, provides a means of reviewing an administrative order for illegality. *See* Mo. Rev. Stat. § 536.150 (allowing a person to challenge an administrative decision in state court through a suit for injunction, certiorari, mandamus, prohibition, or other appropriate action). The state has provided Plaintiffs' due process of law by providing them an opportunity to be heard at a meaningful time and in a meaningful manner – before a court of law. *Keating v. Neb. Public Power Dist.*, 562 F.3d 923, 928 (8th Cir. 2009) ("In order to establish a procedural due process violation, a plaintiff must prove that he or she was deprived of 'an opportunity . . . granted at a meaningful time and in a meaningful manner for [a] hearing appropriate to the nature of the case.'" (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)).

Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Schmidt*, 655 F.3d at 816 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). "Substantive due process prevents the government from interfering with rights 'implicit in the concept of ordered liberty.'" *Dawdy v. Allen*, No. 2:17cv49 AGF, 2018 WL 999974 at *5 (E.D. Mo. Feb. 21, 2018) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). To establish a violation of substantive due process, a plaintiff has to show that "the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Schmidt*, 655 F.3d at 816 (emphasis in original). "As a general matter, the Court has always been reluctant to expand the concept of substantive due

process[.]" *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 72 (2009) (quoting *Collins*, 503 U.S. at 125).

Plaintiffs do not articulate the exact rights they assert under the due process clause. From what the Court can discern, they assert some right to conduct their business and to earn a living. The Eighth Circuit has consistently rejected right-to-conduct-business/right-to-earn-a-living due-process claims. *See e.g., Robbins v. Becker*, 794 F.3d 988, 994 (8th Cir. 2015); *Habhab v. Hon*, 536 F.3d 963, 966 (8th Cir. 2008). Plaintiffs provide no support that the due-process rights they assert are fundamental rights, deeply rooted in this Nation's history and tradition. Plaintiffs have not established a substantive due process violation.

Even if they had established a fundamental right to conduct their business, or earn a living, Plaintiffs have not established "beyond all question, a plain, palpable invasion of rights" under the circumstances of the present pandemic. *Jacobson*, 197 U.S. at 31. During these uniquely rare times, the executive branch has extraordinary powers over businesses. For example, the Defense Production Act, 50 U.S.C. § 4501 *et seq*. allows the President to order companies to produce necessary equipment or increase the production capacity of necessary products. It is not a far reach to say that within the broad limits of the *Jacobson* test, the executive branch may also order businesses to curtail activities to protect the public health and welfare.

At oral argument, the Court asked Plaitniffs' counsel to identify any cases nationwide in which a court restrained enforcement of a COVID-19-related public-health order. In a supplemental brief, they cited one case, *On Fire Christian Center, Inc. v. Fischer*, -- F. Supp. 3d --, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020). As the City Defendants noted, because it

involves very specific "drive in" religious services, not business establishments, it has limited application to this case.  The Court finds *On Fire Christian Center* inapposite.

As noted, the Court does not doubt the earnestness of Plaintiffs' desire to conduct business or engage with their customers face-to-face.  Federal, state, and local governments, along with citizens nation-wide, grapple with the difficult decisions this pandemic has foisted upon our nation, and indeed the globe.  But our Constitution broadly commits the difficult and delicate exercise of emergency powers in a global pandemic to the elected officials of the executive branch.  *In re Rutledge*, 2020 WL 1933122 at *5, 8; *In re Abbott*, 954 F.3d at 792.

Simply put, at times such as we face today, all rights are subject to some invasion. "Under the pressure of great dangers, constitutional rights may be reasonably restricted as the safety of the general public may demand."  *In re Abbott*, 954 F.3d at 778.  Plaintiffs have not established "beyond all question, a plain, palpable invasion of rights"; thus, they do not have a likelihood of success on the merits.

### d.      Privileges or immunities clause

Plaintiffs also challenge the Orders under the privileges or immunities clause of the Fourteenth Amendment, while recognizing that "under current law the privileges or immunities clause . . . likely does not protect the rights of a business owner to conduct business[.]"  The Court agrees, and finds that Plaintiffs are unlikely to succeed on this basis.  *Madden v. Kentucky*, 309 U.S. 83, 90-91 (1940).

### D.      Threat of irreparable harm

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quoting *Iowa Utils. Bd. v. Fed.*

*Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).  Here, the Plaintiffs establish the threat of irreparable harm in the alleged loss of their constitutional rights.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Although the Court finds it unlikely that Plaintiffs would succeed on their constitutional claims, it recognizes that some of Plaintiffs' constitutional rights are currently impinged by the City and County Orders.  As the Supreme Court stated in the face of the smallpox epidemic at the turn of the 19th century, "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29.

E.      **Potential harm to Defendants and the public interest**

The final two factors for a TRO weigh in favor of denial.  As the Court very recently stated in *Frank v. City of St. Louis*, "there can be little doubt that the public interest heavily favors the city's ability to take steps to prevent the spread of this deadly disease."  No. 4:20-CV-00597 SEP, 2020 WL 2116392 at *5 (E.D. Mo. May 2, 2020).  The concerns of Plaintiffs, in conducting their businesses, do not outweigh the severe harm the residents of the City and County could suffer if the Court overrode the Orders.  Government authorities must have the ability to maintain public health and safety in times of great crises such as these. *See Jacobson*, 197 U.S. at 29; *In re Rutledge*, 2020 WL 1933122 at *5-8; *In re Abbott*, 954 F.3d at 783-85.

After weighing the four factors, the Court finds Plaintiffs have not met their burden for a TRO and the Court denies the Motion.  The Court will address the Defendants' dismissal, stay, and abstention arguments in a separate order.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Temporary Restraining Order

[2] is DENIED.

So Ordered this 8th day of May, 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

22